**L. I. BURFORD, Appellant,**

v.

**W. D. BURFORD et al., Appellees.**

No. 10306.

Court of Civil Appeals of Texas.

Austin.

April 6, 1955.

Rehearing Denied April 20, 1955.

Hill D. Hudson, Pecos, Garland Casebier, Fort Stockton, for appellant.

Bradbury, Tippen & Brown, Abilene, for appellee.

GRAY, Justice.

Appellant sued appellees to establish his title to an equal undivided one fourth mineral interest in lands in Runnels and Taylor Counties. He alleged that appellees hold the record title to such lands and by virtue of a parol agreement the equal undivided one fourth mineral interest is held in trust for him.

Appellant's claim to the mineral interest sued for is founded on the following facts: D. L. Burford died intestate in 1922, possessed of the lands which are the subject matter of this suit, and left surviving him his wife and five children. The oldest of the children, Jodie Burford, died intestate after the death of his father but prior to 1927, without having married, without issue and without having adopted any child or children. The other children are: appellant, L. I. Burford, sometimes referred to as Leslie, and appellees, W. D. Burford, C. W. Burford and Mrs. Flossie Morgan who at the time of the trial was Mrs. Flossie Bradshaw. In 1927, the mother and the four children agreed on a partition of the estate of L. D. Burford, deceased. It appears that none of the land was partitioned to the mother. It further appears that all mineral rights in one tract of land had been reserved in a prior grant and that this tract was partitioned to appellant.

Partition deeds were duly executed and delivered, however these deeds did not contain any reservation of mineral rights or any interest therein.

All parties agree that at the time the partition agreement was made and at the time the deeds were executed there was an oral agreement entered into to the effect that the four children would share equally in the mineral rights partitioned to W. D. Burford, C. W. Burford and Mrs. Flossie Morgan. The parties further appear to agree

that this agreement was not written into the partition deeds because they were of the opinion that it would interfere with their titles.

The parties do not agree as to the condition, duration or life of the oral agreement. However there is testimony that in 1927, there was no mineral activity in the vicinity of the lands and that the mineral interests were not regarded as valuable. As to the oral agreement W. D. Burford testified:

"While we was having the deed all fixed the agreement that we all went to, being as Leslie had no mineral rights on his we agreed that we would share in his, we would let him share in ours equal until one sold out; anytime any one of the parties sold out he wouldn't share in that any more from then on because—now this is his suggestion, because, he says, 'I can take the money that I get out of my place and I can buy me another tract of land,' and he says, 'then you folks wouldn't share in that,' and he says, 'when you don't share in that it wouldn't be right for me to share in what I buy and still hold fourth interest in that over there.' He says, 'I can take my money and buy me another place.' We took land. Furthermore, we asked him, my sister did, 'Well, Leslie, would I hold any mineral rights in land if you bought any if you sold?' He says, 'Hell, no' when I sell out I forfeit my rights on all that there,' and he says, 'from then on what I buy, it is mine. If I buy a thousand acres and there's an oil well on all of it it is mine.' Understand, we wasn't thinking much about oil at that time and wasn't very much interested in the oil, but that's what he said.

\* \* \* \* \* \*

"Q. At that time you agreed, did you not, that Leslie Burford was to have a ¼th interest in and to the minerals under what is known as the home section? A. Under the consideration till he sold."

C. W. Burford agreed with W. D. Burford as to what the agreement was and further testified:

"Q. You didn't want a division of mineral rights in your deed but you would agree he could share in those minerals subject to this condition? A. If I kept my land he would have shared in it; I had the right to sell it; I could have sold it. That was my understanding of the agreement.

"Q. As long as you kept the land and owned it he was to have one-fourth of the minerals? A. Until he sold his.

"Q. Until he sold his? A. That's right."

Mrs. Bradshaw, formerly Mrs. Morgan, testified that she understood the agreement just like W. D. and C. W. Burford testified it was and further said:

"Q. In other words, Mrs. Bradshaw, you understood that because L. I. Burford got no minerals under his tract of land he was to share one-fourth of the minerals under what is called the home section, the land that was divided between you and C. W. and W. D., is that correct? A. Until he sold his place."

Appellant gave his version of the oral agreement as follows:

"Q. All right, sir, did you agree that they could hold that for you in their name, was that the agreement? A. Well, I went up there with the understanding that we was to draw that up, you know, in paper; I needed a little money to handle my deal; I wanted to get a loan; none of them didn't have money enough to hardly handle it; so, my papers was fixed first; I went in the loan office and they said I couldn't get a loan; these other boys then, they wouldn't have a fourth in theirs, you know, and we agreed to not put that on paper but I was to get my part of the money, of the lease.

"Q. It was agreed it wouldn't be put on paper but you were to have your interest. Now, what was your interest to be in those minerals under their land? A. One-fourth undivided interest.

"Q. Was there any condition, did you hear any discussion of any condition by which you could lose that one-fourth interest? A. No, sir, I did not.

"Q. Did you understand that there was any agreement by which they could sell your minerals, in selling their land and not account to you for it? A. I knew that they could do it but I didn't think they would.

"Q. Did the agreement, they had the right to do that? A. No agreement at all. That was understood; it was mine when we went up there; when we signed the papers.

\* \* \* \* \* \*

"Q. Now, Mr. Burford, was there anything, any condition with reference to you going out of the agreement if you sold you land, your surface that you had. A. No sir; no agreement whatever, because I had no oil or mineral rights."

The mother was not a party to the cause and did not testify.

Mrs. Morgan sold, or gave, her land to her children in about 1944. They were made parties to the cause and claim as innocent purchasers for value without notice of appellant's claim.

Appellant sold his land in 1945. It appears that prior to 1945, some payments for oil leases and bonuses were made to appellant but none have been made since that time although there is production of oil on some of the land which has been bought in since 1945.

A nonjury trial was had and a judgment was rendered that appellant take nothing and adjudging the ownership of the mineral interest in controversy to be in the record owners.

In response to appellant's request for findings of fact and conclusions of law the trial court found:

"5. At the time the deeds were executed and delivered between the parties, it was verbally agreed that C. W. Burford, W. D. Burford and Flossie Morgan were to account to L. I. Burford for one-fourth of the money received by each from sale of oil and gas leases, rentals and royalties received from the lands covered in their respective deeds, until he sold his land; that L. I. Burford was not to participate in any of the revenues derived from the sale of oil and gas leases, rentals and royalties after he sold the tract of land which he obtained in his deed through a division of his father's estate. The said L. I. Burford did, in fact, sell his land in 1945, and at the date of said sale the agreement that he had theretofore had with W. D. Burford, C. W. Burford, and Mrs. Flossie Morgan as to receiving one-fourth of the revenues from the sale of oil and gas leases, rentals and royalties terminated and came to an end at that date.

"6. That at the time the deeds to the respective parties were made in 1927 W. D. Burford, C. W. Burford and Mrs. Flossie Morgan did not falsely represent to L. I. Burford that he was to have a one-fourth mineral interest in the lands described in the various deeds but was to receive only one-fourth of the money received from the sale of oil and gas leases, rentals and royalties until such time as L. I. Burford sold his land. There were no false representations made to L. I. Burford by the other parties for the purpose of securing the deeds to the land in question."

Appellant here presents some eighteen points, however, we have concluded that it is not necessary to discuss all points because our disposition of two will render all others immaterial. These two points are to the effect that the trial court erred in

refusing to hold that the 1927 oral agreement was unfair and inequitable as to appellant, and in holding that the agreement was enforcible because the evidence showed it to be unfair and ambiguous.

■ In any event, for appellant to recover, it is necessary that the oral agreement as alleged, and as testified to, by him be established. Even if the mineral interests in controversy be considered a part of the consideration for the partition deeds and the oral agreement terminated when appellant sold his land in 1945, it cannot be said there was a failure of consideration for the deeds. At most an issue of fact was presented as to what the oral agreement was, the evidence on the issue was conflicting, the trial court resolved the conflict by his finding number 5 supra, and that finding is conclusive here. 3–B Tex.Jur. Sec. 941, p. 457. For this reason it becomes immaterial whether the oral agreement of 1927 vested mineral rights as such in appellant or merely the right to receive one-fourth of the revenues from the rentals or sales of oil and gas since his right to either was terminated by the sale of his land in 1945.

■ Appellant says that the oral agreement is ambiguous and that the condition of such agreement as found by the trial court, is, as to him, unfair and results in a forfeiture of his mineral right. He cites Decker v. Kirlicks, 110 Tex. 90, 216 S.W. 385, 386, wherein the court said:

"If the provision is ambiguous, that alone condemns it as a forfeiture provision. A forfeiture should rest upon surer ground. Where a contract is *so vague in its terms that a court cannot determine its meaning,* it would be unjust to enforce a forfeiture under it against one whose only fault has been to possibly mistake its meaning. Forfeitures are harsh and punitive in their operation. They are not favored by the law, and ought not to be. The authority to forfeit a vested right or estate should not rest in· provisions whose meaning is uncertain and obscure. It should be found only in language which · is plain and clear, whose unequivocal character may render its exercise fair and rightful." (Emphasis added.)

That cause was a suit brought to quiet rights held under an oil lease on about 20 acres of land laid off in one acre tracts. The lease provided:

"It is further agreed that in the event oil is found in paying quantities in said first well, then the lessee agrees and covenants that within thirty days from the completion of such successful well he will begin the boring of, a second well on some other acre of said tract herein leased, and continue to bore additional wells with due diligence in such order as to additional wells on the tract herein leased as developments may justify, until at least five or six wells have been completed, or the acre upon which said second party has failed to drill a well reverts to the first party by written notice to that effect being served upon said second party by said first party."

Two wells were drilled on different tracts. Five wells were actually completed with four of them on the same one acre tract. Upon the trial a verdict was directed quieting the rights under the lease. Upon appeal the Court of Civil Appeals held that the above provision of the lease was ambiguous and that its meaning should have been submitted to a jury for decision. Kirlicks v. Texas Co., 201 S.W. 687.

With reference to the above provision of the lease the court said:

"It is not necessary that we determine whether this clause in the lease requires the boring of the five wells upon five different acres, or sanctions their location upon but two different acres. If it be conceded that it admits of the first construction, it is not certain that such is its true construction. It does not plainly say that each of the wells shall be upon a different acre. It is only by inference, at best, that

such meaning can be gained from the language. A provision so indefinite as to the obligation imposed, is incapable of supporting a forfeiture."

Clearly there is a distinction in the question here presented and the question presented in Decker v. Kirlicks supra. Here if the oral agreement was as it was testified to be by appellant then there is no question presented as to its meaning. On the other hand if such agreement was as it was testified to be by appellees, who testified, then appellant's mineral rights terminated when he sold his land in 1945.

The question presented is a determination of the agreement entered into. When the agreement is established its construction presents no difficulty.

Appellant having failed to establish the oral agreement alleged by him, other points presented become immaterial and need not be noticed here.

The judgment of the trial court is affirmed.

Affirmed.

HUGHES, Justice.

I respectfully dissent.

I agree with the majority that we are bound by the terms of the agreement as found by the trial court even though such finding convicts the parties of making an agreement which is, in my opinion, unreasonable, inequitable, nonsensical and void for want of consideration.

The Burford children, three sons and a daughter, in 1927, owned, in equal undivided shares, certain lands which formerly belonged to the community estate of their father and mother. One half of this property was acquired by inheritance from their father, the one half apparently by gift from their mother. Some of these lands carried their minerals and others did not. The children, desiring to partition the property among themselves, agreed upon the value of the lands and how they should be divided so that each would receive an equal portion.

The tract set aside to appellant carried no minerals, the other three tracts did. The parties understood, when the partition was made, that the minerals had no present value but that they did have a potential value. Mr. C. W. Burford explained the agreement regarding the minerals as follows:

"Q. Mr. Burford, let's get down a minute to this situation, as a matter of fact that agreement was made in fairness to L. I. Burford at that time because he had no minerals, wasn't it? A. Yes, sir.

"Q. It was made in order that he might share equally with the rest of you children in his dead father's property in so far as minerals interests were concerned, isn't that right? A. It was right up until the time he sold.

"Q. I am talking about the making of the agreement whatever it was; will you answer this question: you testified that when I took your deposition over at Abilene, didn't you, that if you sold royalty as royalty you owed the other parties their interest in it, didn't you so testify? A. My understanding is that if we sold royalty up until the time he sold his that we would divide it.

"Q. You were to divide the money four way, that's right, isn't it? A. Yes.

"Q. In other words, you had recognized a one fourth interest in there and you gave a deed which covered, according to the record, all of it, but you had this oral agreement with reference to minerals alone, didn't you? A. Yes, that was in regards to the minerals, our oral agreement was.

"Q. In other words you treated, you said the land here under this deed put his minerals under an oral agreement, that was between yourselves, wasn't it? A. That's right.

"Q. And wasn't of record; now, will you tell me this, sir, how in the

world could Mr. L. I. Burford's sale of the surface, which is all in the world he had, of the tract of land that he got effect his mineral interest in the home section? A. Well, let me tell you about that; he could sell his land and take the money and go buy him some land elsewhere with the minerals intact; that way, then, he would have his and we would have ours."

W. D. Burton testified regarding the agreement:

"Q. At that time you agreed, did you not, that Leslie Burford was to have a ¼th interest in and to the minerals under what is known as the home section? A. Under the consideration till he sold.

"Q. I will get to that. A. That's what it was.

"Q. Right at that time he had a ¼th mineral interest in the, under the home section or the land you all divided that had been the home property of D. L. Burford, is that right. A. As long as each one it went from—

"Q. I will get to that, Mr. Burford; I will get to that. At the very time the agreement was made and immediately thereafter Leslie Burford had an undivided fourth interest in the minerals which you held, which C. W. Burford held, which your sister held on what is known as the old home section, is that right? A. We all had it until one sold; if any one sold that forfeited him out, any of us; that went for all."

Mrs. Bradshaw testified regarding the agreement:

"Q. What was the reason for giving L. I. an interest in those minerals, Mrs. Bradshaw? A. What was the reason for giving him an interest?

"Q. Recognizing the fact he had an interest in those minerals? A. Well, he had an interest as long as he kept it. When he sold—

"Q. I know—what was the reason for making that agreement; wasn't it the fact he had no minerals under his land? A. Yes.

"Q. That was the reason for it, wasn't it? A. Well, he had no minerals, but then he was to keep that until he sold.

"Q. I understood you to say that, not arguing with you, Mrs. Bradshaw —the reason for it, the reason that you all were to hold for him the minerals under that land, outside of the deed, off of the record as you might say, was because he got no minerals under the land he got in the division? A. We wanted to be fair with him.

"Q. And he got no minerals? A. We wanted to be fair with him, but when he sold he must be fair to us too.

"Q. But the basic reason for the agreement was because he had no minerals under his land, and as you say, you wanted to be fair with him, so each of you agreed he would have one-fourth of the minerals under the other land subject to the condition you keep reminding me of, is that right? A. Yes.

"Q. Now, Mrs. Bradshaw, to whom did you sell your part? A. I let the children have my part."

Appellant who was sixty seven years old at the time of trial and the oldest of the Burford children testified:

"Q. Now, at that time was there any agreement made between you and your brothers and your sister with reference to the minerals under what has been called here the old home section? A. Yes, sir. You see, we valued that land straight through at $30 an acre and I paid just as much for mine with the understanding I was to get my mineral rights over on the other place.

"Q. You were to have a one-fourth mineral interest undivided under the other place? A. Yes, sir.

\* \* \* \* \* \*

"Q. All right, sir, would you have signed the deeds to your two brothers and your sister dividing your father's property if you hadn't believed that they would carry out the agreement you testified about with reference to your owning one-fourth of the minerals under the other land? A. No, I wouldn't have signed it if I thought that I wasn't going to get mineral rights."

I quote from a letter written by appellant to his brother W. D. Burford:

" * * * I would like to know just how you would feel if you were in my shoes—the land I was on had no royalty. You knew, natcherly if I got any royalty it had to come from over there which would give me my part and make the places equal; one fourth of the royalty was never yours to start with and that goes to Wirt and Flossie too. I know I signed the deeds with the understanding you all were to let me have my part. you said you dident your deads messed up. It dident make any difference either way about my land sold for net as far as the oil goes I couldent lease nor sell any Royalty because it was not there * * * I sure dident sell any oil of yours or any one else. now I will admit that that shold have ben in the deads but it is not. you all said your word was as good as your bond lets see. If that had ben in the deads you would come across. God knows I am a heir I have tried to get you all to an understanding and have counted on that a long time and rember I still clame a child's part of the undivided oil and will untill you all do something about it is not yours and never was I mean ¼ of the oil & royalty. * * * "

The effect of what the parties did and said, so it seems to me, is simply that the minerals under the home section were left intact and unpartitioned.

The agreement, found by the trial court, that appellant would forfeit his vested mineral interest if he sold his lands is unen-

forcible for the reason that it is wholly without consideration, there being no mutual promise or anything of value paid or promised by the other children in return for such agreement.

In my opinion the majority should dispose of the other defenses presented by appellees and if found to be without merit that this cause should be reversed and rendered for appellant.